DAY & ZIMMERMANN SERVICES, A DIVISION OF DAY & ZIMMER-MANN, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

J & J Maintenance, Inc., Intervenor.

No. 97–90C.

United States Court of Federal Claims.

July 14, 1997.

Stephen G. Anderson, Knoxville, TN, attorney of record for plaintiff.

Alan Lo Re, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Major Kelly Wheaton, United States Army, Arlington, VA, of counsel.

Donald E. Barnhill, San Antonio, TX, attorney of record for intervenor.

OPINION

REGINALD W. GIBSON, Senior Judge.

## INTRODUCTION

This is a post-award bid protest case, brought before this court pursuant to 28 U.S.C. § 1491(b). Plaintiff, Day and Zimmermann Services (DZS), the incumbent and unsuccessful bidder, objects to the award of a contract by the United States Department of the Army (Army or defendant) to J & J Maintenance, Inc. (J & J), the intervenor, for the maintenance of certain housing facilities located at the U.S. Army installation in Ft. Bragg, North Carolina. DZS challenges the Army's evaluation of its proposal, in addition to the Army's decision not to communicate clarifications or conduct discussions with respect thereto. Defendant maintains, on the other hand, that its award to J & J is justified, because J & J's proposal represents the best value to the Government, and that any error it may have committed during the course of the procurement was harmless. For the reasons stated hereinafter, we grant plaintiff's motion for injunctive relief limited to ordering defendant to cancel its award to J & J, and further enjoining any such contractual award until such time as discussions are conducted and best and final offers (BAFOs) are evaluated.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 1, 1996, the defendant, the United States acting through the Army, formally issued a Request for Proposals DAKF40–95–R–0006 (RFP or Solicitation) for Family Housing Maintenance and Operation of the U–Do–It Center, at Ft. Bragg, North Carolina. Through said RFP, the Army sought proposals for maintaining approximately 5,094 family housing units at Ft. Bragg and for operating a "U–DO–IT" center to supply residents with materials for their own home improvements and repairs. More specifically, the RFP contemplated the grant of a cost-plus-award fee (CPAF) contract[1] to provide maintenance and repair, minor construction. asbestos and lead paint abatement, pest control, cleaning of quarters, receiving and responding to service orders, material and appliance handling, warehousing, and record keeping. The contract called for under the Solicitation was for a period of one base year and four one-year options, in addition to an initial transition period from the incumbent to the successful bidder. DZS and J & J were among thirteen (13) firms to bid for this contract.

The method by which the Army selected a contractor for the RFP at issue was set forth in the Source Selection Plan (SSP). Three organizational bodies were charged with the responsibility of evaluating the proposals: (1) the Source Selection Authority (SSA); (2) the Source Selection Advisory Council (SSAC); and (3) the Source Selection Evaluation Board (SSEB). The SSA, comprised of one individual, was responsible "for the proper and efficient conduct of the *entire* source selection process" and was vested with the authority to "[m]ake the final source selection decision." JX 1, Vol. 3, Tab E at 1–4 to 1–5 (emphasis added).[2] The SSAC was charged with the responsibility of advising, recommending, and assisting the SSA in its final award decision. To do so, the SSAC compared and evaluated the analyses of the SSEB. The SSEB, in turn, was responsible for conducting "a comprehensive review and evaluation of each proposal against solicitation requirements and approved evaluation criteria." JX 1, Vol. 3, Tab E at 1–6. To achieve this, the SSEB, headed by a Chairmen, was broken down into individual committees to evaluate specific aspects of the submitted proposals. Specifically, the SSEB was comprised of a Management Committee, a Technical Committee, a Past Performance Committee, and a Cost Committee. Addi-

---

1. Federal Acquisition Regulation (FAR) 48 C.F.R. § 16.305 (1996).

2. The following abbreviations are used throughout this opinion:
Tr.—Transcript of the hearing on plaintiff's motion of permanent injunction;

DX—Defendant's Exhibit; and
JX—Joint Exhibit.
The sole joint exhibit here, JX 1, is the administrative record, consisting of nine (9) separately bound volumes.

tionally, the Contracting Officer (CO) participated in the procurement process, primarily as an advisor to the SSA, SSAC, and SSEB. It was also the duty of the CO to issue clarification requests and conduct discussions.

The RFP notified all bidders that the Government intended to "evaluate proposals and award a contract without discussions with offerors (except communications conducted for the purpose of minor clarification)." JX 1, Vol. 2, Tab D at L–2. The Solicitation further provided that an award would be made to the offeror whose proposal represented the "best overall value" to the Government, taking into account other factors in addition to cost. JX 1, Vol. 2, Tab D at M–2. More specifically, pursuant to the terms of the RFP, three factors were taken into consideration when evaluating each proposal, i.e., quality, past performance, and cost. Quality was substantially more important than either past performance or cost. Past performance and cost, however, were considered of equal performance. The RFP further indicated that the importance of the cost factor would increase as the quality difference between the bidders decreased.

The "quality" factor, which was numerically scored, included two sub-categories: management and technical excellence. Among the two, management was "somewhat" more important than technical excellence. Furthermore, these two sub-categories were each comprised of five individual elements, as follows:

A. QUALITY

Subfactor 1—Management

1. Within the Management subfactor under Quality, there are five subfactors. The first two are equal in importance, the third is somewhat less important than either of the first two, and the last two are each somewhat less important than the third:

(a) Corporate Structure and Experience

(b) Quality Control

(c) Transition—Phase-in/phase-out

(d) Security

(e) Safety and Health

Subfactor 2—Technical Excellence

2. Within the Technical Excellence subfactor under Quality, there are five subfactors. The first is somewhat more important than the second, however, both the first and second are significantly more important than any one of the last three[,] which are each equal in importance:

(a) Technical Approach

(b) Technical Staffing

(c) Subcontractors

(d) Property and Records Management

(e) Automatic Data Processing Equipment (ADPE) Network.

JX 1, Vol. 2, Tab D at M–2. The RFP further provided that the offerors had to submit a subcontracting plan for the base year and each of the four additional option years. The plans were evaluated as either "acceptable" or "unacceptable."

Past performance was evaluated by utilizing the information obtained from past performance records furnished with the proposal and responses received to past performance surveys. This factor was not rated numerically, but rather rated adjectivally, i.e., exceptional, outstanding, satisfactory, or poor.

To assess an offeror's cost proposal, evaluators took into consideration two factors: cost realism and fee structure. Of these two factors, the RFP indicated that cost realism was significantly more important than fee structure. The RFP also notified offerors that cost realism would be evaluated using the Government's cost and price analysis, styled the Most Probable Cost Estimate (MPCE).

DZS's initial proposed cost was $36,843,398, whereas J & J's initial proposed cost was $37,011,393. Premised on the Government's cost realism analysis, $2,462,709 was added to DZS's cost proposal, for an MPCE of $39,306,187. The MPCE for J & J's proposal was $38,873,826, reflecting a cost adjustment of $1,862,433.

Following the agency's evaluation, it was determined that J & J represented the "best

overall value" to the Government, and DZS was rated second, with the following scores:

| Offeror | Quality | Past Performance | Subcontracting Plan | MPCE | Initial Cost Proposal |
|---|---|---|---|---|---|
| J & J | 89.25 | Exceptional | Acceptable | $38.873,826 | $37,011,393 |
| DZS | 86.83 | Outstanding | Unacceptable | $39.306,187 | $36,843,398. |

In connection with the foregoing evaluations, a decision was made to award the subject contract without conducting discussions. Thus, the CO notified DZS, by letter dated December 9, 1996, that the contract had been awarded to J & J, given the initial proposals received.

Pursuant to Federal Acquisition Regulations (FAR), DZS attended a debriefing on December 18, 1996, during which the Army explained the evaluation process and the deficiencies noted in DZS's proposal. That same day, plaintiff filed a protest with the General Accounting Office (GAO), challenging the Army's evaluation of its proposal. Before reaching a decision on the merits, however, the GAO dismissed plaintiff's protest on February 3, 1997, for procedural reasons. The transition from the incumbent contractor, DZS, to the successful bidder, J & J, as the contractor, was scheduled to take place on February 27, 1997, and DZS's current contract was set to expire on March 16, 1997.

Instead, on February 11, 1997, plaintiff filed its complaint with this court, in addition to an application for a temporary restraining order (TRO) and preliminary and permanent injunction. Plaintiff's motion for a TRO was denied as moot.[3] Its motion for preliminary and permanent injunctive relief were thereafter consolidated, and a hearing was held on the merits for a permanent injunction from February 18, 1997 to February 24, 1997.

## CONTENTIONS OF THE PARTIES

### Plaintiff

Alleging that the record before the court entitles it to injunctive relief, plaintiff avers that the court should, therefore, cancel the award to J & J and permanently enjoin any award until and unless the Army engages in discussions and evaluates any ensuing BAFOs.[4] Plaintiff claims that the Army's decision awarding the contract to J & J is arbitrary and capricious for several reasons. One reason, charges plaintiff, is that the Army's cost realism analysis, in particular the derivation of the MPCE for its proposal, is unexplained and unsupported by any probative documentation in the administrative record.[5] Plaintiff declares that for all that "the [a]dministrative [r]ecord shows, the cost analyst could have simply made up the figure...." Pl. Post Trial Mem. of Law at 8. Next, plaintiff asserts that the Army's decision not to conduct discussions or clarifications, in light of the *evaluators' request* for clarifications as to DZS's proposals, was an abuse of discretion. Had the contracting officer requested clarifications or conducted discussions, contends plaintiff, the determination that its proposal was understaffed "might well have changed." Pl. Post Trial Mem. of Law at 3. In this connection, plaintiff further argues that without the benefit of, at the minimum, the requested clarifications the evaluators' assessment of its staffing pro-

---

**3.** At the TRO hearing, held February 12, 1997, the Army and intervenor agreed to stay any further transition of the award from DZS to J & J, pending the outcome of this court's hearing on the propriety of issuing a permanent injunction in the instant case.

**4.** Originally, in its complaint plaintiff requested additional remedies. However, in its post-trial brief, plaintiff modified the relief sought in light of the evidence adduced at trial, and now re-

quests that injunctive relief be so limited. Plaintiff's Post Trial Memorandum of Law, filed March 17, 1997 (Pl. Post Trial Mem. of Law), at 20.

**5.** In its complaint (at para. 11) plaintiff alleged that the Army violated 48 C.F.R. § 15.608(a) (1996), because defendant failed to document, on the record, the manner in which it arrived at the MPCE.

posal was patently unreasonable. Moreover, according to plaintiff, the evaluators failed to take into consideration DZS's proven efficiency, and instead chose to rely on an inaccurate benchmark to assess whether DZS's proposal was realistic. Finally, plaintiff alleges that the evaluators inexplicably and unreasonably failed to consider its nomination, by officials at Ft. Bragg, for the "1996 Contractor of the Year" award, when evaluating DZS's past performance. Plaintiff submits that had the information regarding its nomination been taken into consideration, it is reasonable to infer that such information would have favorably effected DZS's evaluation. Thus, and for all of the foregoing reasons, plaintiff concludes that the Army's award decision was arbitrary, capricious, and in violation of law, and, accordingly, injunctive relief is warranted.

*Defendant*

Conversely, defendant strenuously contends that its award to J & J was reasonable. In support of its position, the Army emphasizes the "extraordinary burden" plaintiff must bear. According to the defendant, the plaintiff has failed to demonstrate by clear and convincing evidence that its award to J & J was irrational. Rather, argues defendant, its award decision is grounded in reason, because J & J's proposal clearly represents the best overall value to the Government, ranking first in all evaluation factors and submitting the only "acceptable" subcontracting plan. The Army further avers that DZS chose, at its own risk, to base its proposal on data not contained within the RFP, but instead on information available to it as the incumbent contractor. DZS, alleges defendant, also failed to offer any explanation in its proposal to support the propriety of using a smaller staff than that anticipated by the Government and set forth in the RFP. Therefore, the Army, in the absence of any explanation, reasonably found DZS's staffing proposal deficient.

As to plaintiff's challenge to the MPCE, the Army asserts that the administrative record and the evidence as a whole adduced at trial provide ample documentation to support the derivation of the MPCE for DZS's proposal. Furthermore, defendant submits that it was under no obligation here to either request clarifications or to hold discussions. Also, defendant argues that, had the contracting officer requested the alleged "clarifications," it would have triggered "discussions," which the Army sought to avoid. Moreover, insists defendant, the decision not to conduct discussions is reasonable, because all offerors were warned by the RFP that the Army intended to award the contract on the basis of the proposals received and, further, J & J's proposal outranked all offerors in all three award factors, *i.e.*, quality, cost, and past performance.

With regard to DZS's past performance evaluation, the Army contends that it complied with the procedure set forth in the RFP, that it had no knowledge of the nomination until after the award decision had been made, and that the burden of providing this information rested with plaintiff. Lastly, defendant maintains that DZS is not entitled to relief, because it has failed to demonstrate any prejudice it has suffered as a result of the alleged errors in the procurement process. Thus, contending that plaintiff has failed to meet the requisite burden of proof, the Army concludes that its award to J & J must be upheld.

**DISCUSSION**

I. *Standard of Review*

Previously, this court's authority to grant equitable relief to disappointed bidders was limited to only those actions brought *before* a contract was awarded, *i.e.*, pre-award bid protests. In 1996, Congress expanded this court's jurisdiction to hear post-award bid protests concurrently with the federal district courts. *See* 28 U.S.C. § 1491, *as amended by* the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, 110 Stat. 3870, 3874–74.

Actions brought before this court under our new bid protest jurisdiction must be reviewed pursuant to the standards set forth in 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4); *Cubic Applications, Inc. v. United States,* 37 Fed. Cl. 339, 341 (1997) ("Under the new version of the statute, this court must also apply the standards set out

by the APA in reviewing the agency's award decision."). Accordingly, an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). In making this determination, a reviewing court:

[M]ust consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (citations omitted). Moreover, the court's review of agency action is, as a general rule, limited to the administrative record. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).[6] Thus, "[i]f a ... finding is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded to [it] for further consideration." *Camp,* 411 U.S. at 143, 93 S.Ct. at 1244.

█ However, where an agency's decision is found reasonable, a "court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct at 824. Put differently, "[a] court has no warrant to set aside agency action as arbitrary or capricious when those words mean no more than that the judges would have handled the matter differently had they been agency members." *Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1299 (D.C.Cir.1971); *see also Widnall v. B3H Corp.,* 75 F.3d 1577, 1579 (Fed.Cir.1996).

█ Furthermore, it is well-settled that procurement officials are entitled to broad discretion in the evaluation of bids and in the application of procurement regulations, particularly in those instances where, as here, a negotiated procurement is at issue. *See TRW Envtl. Safety Sys., Inc. v. United States,* 18 Cl.Ct. 33, 43 (1989). Consequently, to show arbitrary and capricious conduct, in a bid protest action, the plaintiff bears a

*heavy burden* of showing, by *clear and convincing evidence,* either:

(1) that the agency's decisionmaking [*sic*] process lacked a rational or reasonable basis, or (2) that the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.

*Bean Dredging Corp. v. United States,* 19 Cl.Ct. 561, 567 (1990); *Strategic Analysis, Inc. v. U.S. Dept. of Navy,* 939 F.Supp. 18, 22 (D.D.C.1996) (quoting *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir. 1973)).

█ In addition, minor errors or irregularities, *i.e.,* harmless errors, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision. *See* 5 U.S.C. § 706(2) (court must take into account rule of prejudicial error). To establish a *prejudicial* error, a protestor is not required "to show that but for the alleged error, the protestor *would* have been awarded the contract." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) (emphasis added). Rather, "a protestor must [only] show that, had it not been for the alleged error in the procurement process, there was a *reasonable likelihood* that the protestor would have been awarded the contract." *Id.* (emphasis added); *see Strategic Analysis,* 939 F.Supp. at 23 (analyzing award of contract under 5 U.S.C. § 706(2)(A)).

With the following considerations firmly in mind, we begin our analysis with a review of the Army's evaluation of DZS's cost proposal.

## II. *The Merits*

### A. *Evaluation of Cost—Most Probable Cost Estimate (MPCE)*

In a cost reimbursement contract, such as the one at issue here, the Government is responsible for all actual and allowable costs, regardless of the offeror's proposed cost. 48 C.F.R. § 16.301–1 (1996). Accordingly, an agency is required to conduct a cost realism analysis inasmuch as a bidder's *estimate* may not be a valid indication of actual costs. 48

---

**6.** However, in limited circumstances, a court may consider "extra-record" evidence. *See Cu-*

*bic,* 37 Fed. Cl. at 342 (citing *Esch v. Yeutter,* 876 F.2d 976 (D.C.Cir.1989)).

C.F.R. § 15.605(c) (1996). In the instant case, to determine whether an offeror's cost proposal was "realistic," given the proposed methodology contemplated in performing the tasks called for by the Solicitation, the cost analyst developed a Government-perceived MPCE for each proposal.

Here, DZS's *initial* proposed cost was $36,843,398, or $167,995 *less* than J & J's proposed cost of $37,011,393. However, upon subsequent evaluation by the Government's cost analyst, $2,462,709 was added to DZS's initial cost proposal, approximately $1.5 million of which is traceable to direct labor. J & J's proposed cost also was increased, but only by $1,862,433. As a result, the MPCE for DZS's proposal, *i.e.*, $39,306,187, was $432,361 *more* than the MPCE of $38,873,826 for J & J's proposal.

Plaintiff does not dispute the propriety of conducting a cost realism analysis. Rather, plaintiff's primary contention here is that the administrative record fails to contain *any* documentation from which either it or the court can review the reasonableness of the Government's adjustments to its proposal. Defendant, on the other hand, argues that the administrative record and the evidence adduced at trial are sufficient for this court to find that the Army's adjustment of $2.4 million to DZS's proposal was not arbitrary and capricious. Intervenor echoes defendant's assertions, adding that one can arrive at the adjustment to DZS's proposal, given the information in the administrative record, by "reverse engineering," whatever that might mean. Intervenor's Post Trial Memorandum of Law at 16.

Upon a careful review of the entire record, we agree with plaintiff and find that the derivation of the MPCE for DZS's proposal is not sustainable on the record before this court. We begin by acknowledging that the Source Selection Plan (SSP), included in the administrative record, reveals the factors to be taken into consideration when determining the MPCE for each proposal. It states, in relevant part, that:

> The cost proposals will be evaluated against the Independent Government Estimate (IGE). The Technical and Management Committees will evaluate the [o]ffer-

ors' method of performing the work. The proposed method will be compared to the methodology which was used to prepare the IGE. Differences will be resolved by the Technical and Management Committees and the most probable staffing developed. This most probable staffing will be used to create the MPC[E].

JX 1, Vol. 3, Tab E at III–39. In addition, the SSP directs the Cost Committee to:

> [D]evelop the [MPCE], ..., based on the findings of the initial detailed cost analysis of the offeror's proposal, ..., the comments/recommendations provided by the other Committees of the SSEB, the input provided in the DCAA Audit Report, the Independent Government Estimate, and the Cost Evaluator's best judgment.

JX 1, Vol. 3, Tab E at III–42. Thus, the Cost Committee, comprised of one individual, Ms. Cheryl Nixon, had to take into consideration a variety of factors, including comments from the SSEB's Technical and Management Committees and the independent government estimate, to arrive at the MPCE. Ms. Nixon, after computing the MPCE, also was responsible for composing a report of her findings for each proposal. This narrative report, entitled the "Initial Proposal Report of Cost Evaluation" addresses the relative strengths and weaknesses of each offeror's cost proposal. *See* JX 1, Vol. 7, Tab H/10 at Bugs Bunny 1. For instance, the report indicates whether certain labor categories were appropriately staffed, and suggests that adjustments to the proposed cost were made to reflect any noted deficiencies. We recognize that the administrative record includes DZS's cost proposal, the cost analyst's report addressing DZS's proposal, and the independent government estimate. However, we further note that there is no documented evidence contained within the four corners of the administrative record which establishes the method by which the MPCE was derived, beyond simply stating the factors taken into consideration. Put differently, the administrative record reveals rather vaguely *why* adjustments to cost were made, but not precisely *how* those deficiencies noted in the offeror's proposal were translated into the MPCE.

Ms. Nixon's testimony, however, provided only some highly generalized insight into the cost realism analysis and the process by which the Army derived the MPCE. Specifically, Ms. Nixon testified that:

[W]hen the [T]echnical [C]ommittee was evaluating whether or not the proposed categories and man-years were reasonable in ... an offeror's proposal, they were to use the *general rule* that they either accept[ ] the offeror's proposed labor categories and man-years [or not]. And if they did not accept that[, the proposed man years or labor categories,] because they did not feel that [it] was justified or reasonable, then they would accept what was in the independent government estimate.

Tr. 941 (emphasis added).[7] Accordingly, if the Technical Committee concluded that the proposed man-years for any given labor category was inadequate, it would indicate that the man-years proposed should be increased to that set forth in the Government's estimate. Thus, the increase in man-years would, in turn, result in an upward adjustment to the offeror's proposed cost. Perhaps, at first blush it appears as if the court can "reasonably discern" the path[8] the Army took, given the administrative record and Ms. Nixon's testimony. But our analysis does not end here.

During the course of Ms. Nixon's testimony, *i.e.*, the fourth day of the five-day hearing, counsel for defendant attempted to elicit testimony regarding the extent of the cost analysis she conducted. Upon plaintiff's objection, it came to the court's attention that Ms. Nixon obtained written recommendations from the Technical Committee regarding DZS's cost proposal. Such recommendations apparently formed the basis from which the MPCE was derived. However, despite their obvious and admitted relevancy, these written recommendations were curiously *not* included in the administrative record nor produced to plaintiff. The court, in determining whether to sustain plaintiff's objection to defendant's attempts to orally supplement the record with Ms. Nixon's testimony regarding the contents of a technical evaluation document used to make adjustments to plaintiff's proposal, inquired into the precise nature of this extra-record document. The following is the exchange that took place between defendant's counsel, Ms. Nixon, and the court, during defendant's examination of Ms. Nixon:

Counsel for the defendant:

Q: Ms. Nixon, what information did you receive from the evaluation committee with regards to the understaffing [*sic*] issues that were presented from the committee to you?

A: I received ... a format I drew up and gave to the technical committee which ... had four columns on it. It showed the labor categories that were either—that were proposed and on the IGE. It had a column which showed how many man years for each of those labor categories the contractor proposed. It had a column that showed the man years estimated in the IGE for each labor category. And then it had an additional column where the technical evaluator would write in their recommendation as to whether he recommended [that] we accept[ ] what the offeror proposed or that we adjust it in accordance with the IGE.

\*　　\*　　\*　　\*　　\*　　\*

---

**7.** Ms. Nixon further testified that to her knowledge this "general rule" is not codified in any statute or regulation, nor presumably in any document contained within the administrative record. Tr. 941–42.

**8.** Intervenor submits, as previously noted, that the MPCE can be derived by reverse engineering given the totality of the administrative record. The court acknowledges that a decision of less than ideal clarity can be upheld if the "agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42

L.Ed.2d 447 (1974). However, the problem presented here is, simply stated, that defendant's failure to include the uniquely-relevant documents in the administrative record and to submit them to plaintiff deprives this court and plaintiff of the ability to assess the reasonableness of the path the Army took. *Defendant's conduct during the course of the hearing leaves this court asking itself why these documents, which apparently would resolve plaintiff's challenge to the derivation of the MPCE, were not included in the administrative record, nor subsequently produced to plaintiff.*

Q: And based on those recommendations, what did you use those recommendations for?

A: To make adjustments to the offeror's proposed cost to calculate—to compute the most probable cost estimate.

\* \* \* \* \* \*

THE COURT: Excuse me, how would you characterize that document you just testified about, that you initiated ... and forwarded ... to another entity and they returned it to you? How would you characterize that document?

[A]: Okay, in the official contract file, I have it tabbed as technical evaluations.

\* \* \* \* \* \*

THE COURT: Oh, okay. Now, where is that document or those documents? Where are they now?

A: They're in my motel room. I brought them with me.

THE COURT: And do you use those documents to make adjustments to the proposals of DZ[S]?

A: Yes, sir.

THE COURT: And they're not in the administrative [record]?

A: No, sir.

Tr. 852–54. In light of the foregoing, the court sustained plaintiff's objection because: (1) defendant had the "technical evaluation" document in its possession; (2) defendant failed to offer any reason for its failure to either produce this document or include it in the administrative record; and (3) the document referred to was the best evidence relevant to the reasonableness of the adjustments made. Moreover, plaintiff was denied the opportunity to cross-examine Ms. Nixon as to the reasonableness of each of the *precise adjustments* made, to the extent that such document formed the basis for the MPCE. Tr. 856.

Subsequently, the defendant, on the fifth and final day of the hearing, offered into evidence the extra-record document at issue,

*i.e.*, the "technical evaluations," marked as Defendant's Exhibit 1, for identification (hereinafter DX 1), to supplement the administrative record. Its proffer to the court was premised primarily on the recognized exceptions (*i.e.*, in limited circumstances that the court may embellish the administrative record, *Esch v. Yeutter, supra*) to the general rule ordinarily limiting a court's review of agency action to the administrative record. Plaintiff objected on grounds that it would be fundamentally unfair to allow defendant to belatedly supplement the administrative record at this final hour. Cognizant of the fact that DX 1, for identification, directly pertained to plaintiff's challenge, the court, nevertheless, upon careful reflection, sustained plaintiff's objection.

Given the significance of this ruling, the circumstances surrounding the ventilation of DX 1, which led the court to sustain plaintiff's objection, warrant amplification here. The facts indicate that defendant was on notice as early as December 18, 1996, when plaintiff filed its protest with the GAO, that DZS challenged the efficacy of defendant's MPCE for its proposal. Specifically, around that time plaintiff stated in its protest that "[t]he [cost] adjustment to DZS's proposal is unwarranted." JX 1, Vol. 1, Tab A/1 at 6. And, as a consequence, with its protest plaintiff also made the following request for certain documents:

(d) Any scoring or rating schemes, tables, matrices, and any other tools used in assessing best value;

(e) All evaluation documents, including evaluation sheets, scoring sheets, technical evaluation comments, and any other evaluative material relating to DZS's proposal. . . .

JX 1, Vol. 1, Tab A/1 at 7. It is clearly axiomatic that DX 1, for identification, falls within the foregoing categories of requested documents *made by* plaintiff. More importantly, a contracting agency, according to statute and regulation governing bid protests,[9] is *required*, once a protest is filed, to

9. *See* 31 U.S.C. § 3553(b)(2) (1994) ("Federal agency receiving a notice of a protested procurement ... shall submit to the Comptroller General a complete report (including all relevant docu-

ments) on the protested procurement. . . ."); 4 C.F.R. § 21.3(c) (1996) (requiring agencies to submit to the GAO "all relevant documents including, as appropriate ... all evaluation docu-

submit in its report to the GAO *all relevant documents,* such as DX 1, for identification, pertaining to the protest at issue. Defendant obviously did not comply with its statutory duty, as it knowingly failed to include DX 1, for identification, in the administrative record, a document which even defendant admits is relevant to the issue here. Tr. 989.

Moreover, in its comments to the Army's report, dated January 31, 1997, plaintiff again challenged the MPCE, specifically on grounds that its derivation was unexplained. There it stated, in pertinent part, that:

> If an agency is to be permitted to use MPCEs as the basis for evaluating offers, rather than the offeror's own bid prices, the agency must at least explain how the MPCEs were derived. If it is not required to do this, there is simply no effective review of the agency's decision.

JX 1, Vol. 1, Tab A/7 at 3 (citation omitted). Finally, in its complaint filed with this court, on February 11, 1997, plaintiff reiterated its contention that the MPCE is totally unexplained and undocumented.

Yet, despite irrefutable knowledge of plaintiff's allegations, in the face of plaintiff's request(s), and in derogation of its statutory duty, defendant obviously *intentionally* failed to produce the extra-record document from which, according to Ms. Nixon's own testimony, the MPCE was in fact derived. This is so because Ms. Nixon admitted that DX 1, for identification, was "in my motel room," *supra.* The court, as noted on the

record, was and remains very troubled by defendant's egregious and inexcusable conduct, resulting in its failure and/or refusal to properly and timely produce this uniquely-relevant document as required by law, and instead choosing to secrete critical information contained therein, through and via the testimony of Ms. Nixon, while such documents remained in her motel room, a fact that did not come to light until *the court* made the relevant inquiry.

Adding further to our concerns was the fact that on the first day of this hearing, defendant objected [10] to plaintiff's request to call an expert rebuttal witness to testify as to the reasonableness of the defendant's cost realism analysis. The court sustained defendant's objection, in light of the fact that there was no reasonable excuse for plaintiff's failure to include that witness on its witness list. In addition, the parties were aware early-on that the final day of the hearing was February 24, 1997, due to this court's prior commitments. It also is worth mentioning that DX 1, for identification, was not similarly identified on defendant's exhibit list.

Given the totality of the circumstances, this court could not in good conscious, and in the interests of fundamental fairness and due process, permit defendant to supplement the administrative record, on the final day of this hearing,[11] with DX 1, for identification, consisting of 36 detailed pages, after having excused plaintiff's expert witness and, more

---

ments."). There is no issue as to the relevance of DX 1, for identification, inasmuch as defendant's counsel at closing arguments also made an unequivocal judicial admission to that effect.

**10.** The following is an excerpt from the record of Mr. Lo Re's objection to plaintiff's motion to supplement its witness list with Mr. Broadecky, an expert rebuttal witness:

> MR. LO RE: Your Honor, I must object to that. This is wholly inappropriate. [A]s a practical matter to begin with, the witness lists were due yesterday. They were literally a two page document. It was something that Mr. Anderson could have easily included in his witness list. In fact, he knew who our witnesses were and what they would testify to as of Sunday at 3:00 p.m. I believe.
> 　　*　　*　　*　　*　　*　　*
> [T]o bring in an expert is absolutely unfair because now, not only do we have people ... who put their proposal together saying why

their proposal should have been interpreted one way, we have a ... person who is outside the entire process coming in to make judgements [*sic*] or ... to render some sort of opinion on what ... the Government did. And that is wholly inappropriate, Your Honor. Tr. 92–93.

**11.** Intervenor made a motion for a continuance, in order to afford plaintiff the opportunity to review DX 1, for identification. We denied intervenor's motion because the court could not allow defendant to benefit from its own wrong in this post award case in which time was clearly of the essence. In spite of this fact, the decision at bar was delayed due to the total incapacitation of the court for two and one-half months with a herniated disk.

importantly, without any reasonable excuse for defendant's failure to earlier produce this document as required by statute.[12] It is clearly evident from this record that defendant produced DX 1, for identification, *only* as an afterthought and following this court's refusal to permit Ms. Nixon to testify as to the contents of DX 1, for identification. Such conduct of defendant, if countenanced by the court, would, of course, have been fundamentally unfair to plaintiff. This is so because, in such case, plaintiff would have been at a decided disadvantage in that it would be required to proceed in cross-examining Ms. Nixon regarding the contents of a voluminous and complex 36–page document which it had never had a reasonable opportunity to previously review with the advice of its proposed expert witness.

In addition to having sustained plaintiff's objection, the court finds that the foregoing circumstances surrounding this case, brought into being entirely by defendant's egregious conduct, resulting in its unexplained failure to timely and properly produce critically relevant documents ostensibly favorable to its interest and to which it had ready and immediate access, unquestionably warrants an adverse inference.[13] Moreover, the court notes and holds that the force of the adverse inference is not dissipated by defendant's last-ditch attempt to produce and offer into evidence DX 1, for identification, at the final hour, because defendant's highly questionable conduct left the court no other reasonable alternative other than to exclude DX 1, for identification, from evidence. Therefore, the court holds that defendant's intentional delinquent production of said document was constructively and effectively tantamount to the realistic fact that defendant had not produced the document at all. Simply put, this court cannot reward the defendant, who, having violated pertinent statutory and regulatory provisions,[14] seeks to absolve itself for its failure to cut square corners with its citizens by belatedly offering said 36–page document into evidence at the last hour. *See Black v. United States,* 25 Cl.Ct. 268, 274 (1992) (citing *Heckler v. Community Health Servs.,* 467 U.S. 51, 61 n. 13, 104 S.Ct. 2218, 2224 n. 13, 81 L.Ed.2d 42 (1984)). Consequently, the court is constrained to infer that had the defendant timely and properly produced DX 1, for identification, as required by law, that document would have revealed information favorable to plaintiff, *i.e.,* it would support plaintiff's contention that the Army arbitrarily and capriciously determined the MPCE for its proposal.

In sum, while we recognize that the documents in fact contained within the administrative record, coupled with Ms. Nixon's testimony, reveals to some extent the broad and esoterical path the agency sought to follow when determining the MPCE, the court cannot conclude: (1) that that is in fact the path the agency undertook when evaluating DZS's proposal; or (2) that said path, if taken, was reasonable. Thus, given the record before this court, with particular reference to the defendant having erroneously failed to follow its own law, we cannot sustain the Army's determination of the MPCE for DZS's proposal as being a reasonable adjustment based on documented, and creditable facts.

### 1. Prejudice

We now turn to address defendant's and intervenor's contention that DZS was not prejudiced as a result of the Army's intentional violation of statute and regulation, which ultimately resulted in the failure to

---

12. Counsel for defendant attempted to explain that it had no knowledge of the existence of the documents at issue prior to this hearing. The court finds this explanation sorely lacking in substance as defendant, acting through the cost analyst, prepared the document at issue for purposes of computing the MPCE for DZS's proposal.

13. It is well-settled that fact finders retain considerable discretion in determining whether an adverse inference is warranted. Simply put, the adverse inference rule, more a "product of common sense than of the common law," *International Union (UAW) v. NLRB,* 459 F.2d 1329, 1335 (D.C.Cir.1972), provides that when a party has relevant evidence within its control and fails to produce such, that failure raises the presumption that if in fact produced, it would be unfavorable to its cause. *Id.* at 1336.

14. *See* 31 U.S.C. § 3553(b)(2) (1994); 4 C.F.R. § 21.3(c) (1996).

produce relevant document(s) necessary to sustain the Army's cost realism analysis of DZS's proposal. We acknowledge that, "[g]enerally, the requirement of proving prejudice prevents an unsuccessful bidder from overturning a contract award due to a harmless violation of a statute or regulation on the part of the government." *TRW Envtl. Safety*, 18 Cl.Ct. at 67. As stated *supra*, a plaintiff is not required to show that it would have received an award *but for* the violation. Rather, to satisfy the prejudice requirement, a disappointed bidder must show *only* that, had it not been for the alleged error in the procurement process, there was a "reasonable likelihood" that it would have received the award.

Conversely, defendant and intervenor assert that even if the MPCE for DZS's proposal is "nullified," the award to J & J is, nevertheless, reasonable and, therefore, plaintiff has failed to demonstrate that it suffered any prejudice. More specifically, defendant avers that J & J's proposal clearly represents the best value for the Government, especially in light of the fact that quality was *substantially* more important than either past performance or cost, which were both of equal importance. Accordingly, in this instance, contends defendant, even if the $2.4 million cost adjustment to DZS's proposal is disregarded, an award to J & J would not only be appropriate but would be required, given J & J's higher rating for both the quality and past performance award factors.

The foregoing assertions of the Government, however, are not supported by the record and amount to mere speculation. We first note that the RFP provides that the importance of the cost factor *increases* as the quality differences between the bidders *decrease*. Here, the quality difference between DZS and J & J was merely a minuscule 2.42 points. Further, the cost difference between DZS's initial proposed cost of $36,843,398, and J & J's MPCE of $38,873,826, is $2,030,428. The Army's contention that such a significant difference in cost, when compared to the minor difference in quality, could not change the award decision is without merit. Rather, the tremendous difference in cost demonstrates that a $2.4 million reduction in DZS's evaluated cost proposal would weigh strongly in favor of awarding the contract to plaintiff.

 To evaluate whether prejudice has been shown, we also take into consideration the "well settled principle of evidence [which provides] that, where a party fails to call a witness available to him and who has knowledge of material facts, the court may draw the inference that the testimony of the witness concerning those facts would have been unfavorable to the party." *Barnett v. United States*, 6 Cl.Ct. 631, 671 (1984) (citations omitted). Here, the defendant,[15] for

---

15. The court recognizes that as a general proposition an adverse inference is not proper where the witness in question is "equally available" to both parties. *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 659 (11th Cir.1988). Availability, as noted by the Eleventh Circuit, turns on:

> ... the witness' relationship with the nonproducing party. A witness is unavailable in a practical sense when this relationship is such that it creates bias or hostility against the opposing party. Because of an employee's economic interest, the employer-employee relationship is recognized as one creating practical unavailability [to the opposing party].

*Id.* at 659–60 (citations omitted). In this instance, the SSA and SSAC's members could reasonably be expected to be favorably disposed or biased in favor of the defendant, because not only were they employees of the Army, but it is in fact *their* award decision which plaintiff contests. Thus, logic dictates that these witnesses were practically "unavailable" to the plaintiff.

The court further notes that the fact that plaintiff called the CO as its witness did not, *ipso facto*, render either the SSA or members of the SSAC practically available to the plaintiff. In the first instance, the fact that plaintiff called the CO does not alter our determination that the aforementioned witnesses are favorably disposed or biased in favor of the defendant, due to their "employer-employee" relationship with the Army. Furthermore, the CO is distinguishable from said witnesses, because here the CO's primary role was that of a technical advisor, not a *decision-maker*. As she testified, not only did she not have a "vote" in the award decision, but she was excused from the critical deliberations, regarding the selection decision, that took place between the SSAC and SSA. Tr. 1038–39. Therefore, it is reasonable to conclude that due to their respective positions and duties in this procurement, the SSA and SSAC bore greater responsibility for the award to J & J, and thus were more in-

some unknown reason, failed to call either the SSA, the person who in fact made the award decision, or any member of the SSAC, the body specifically charged with advising the SSA, to testify, despite the fact that counsel for plaintiff brought their absence to the attention of the court during the course of this hearing. Tr. 1039.

Such witnesses, due to their decision-making position and their role played during the course of this procurement, certainly have critical knowledge of material facts. Consequently, it is clear beyond cavil that these were the only witnesses who could have provided probative testimony as to what impact, if any, a $2.4 million reduction in DZS's evaluated cost proposal would have had on the award decision.[16] Given defendant's unexplained failure to call any of them, the court is constrained to infer that there is a "reasonable likelihood" that plaintiff would have been awarded the contract if its proposal had not been adjusted by $2.4 million. Thus, we find that plaintiff has satisfied its burden of establishing prejudice.

### B. Failure to Conduct Discussions

 We next examine plaintiff's contention that it was unreasonable for the Army not to hold discussions, given the motivation for the cost adjustments made to and the quality evaluation received for its proposal.

In response, defendant argues that it was reasonable to award the contract without discussions because the RFP explicitly stated that the Government intends to "evaluate proposals and award a contract without discussion with offerors ... [h]owever, the Government reserves the right to conduct discussions if later determined by the [c]ontracting [o]fficer to be necessary." JX 1, Vol. 2, Tab D at L–2. As the Army indicates, this provision was included in the RFP pursuant to 10 U.S.C. §§ 2305(b)(4)(A) & (A)(ii) and 48 C.F.R. § 15.610(a) (1996), which authorize award of a contract based upon the proposals received, without conducting discussions, if

clined and disposed to be biased against plaintiff.

16. The court notes that the Army did call the CO to testify as to whether a reduction in DZS's evaluated cost proposal would have effected the

the CO determines that discussions are not necessary and the solicitation contains the provision set forth in 48 C.F.R. § 52.215–16, Alternate II (1996). The Army further maintains that its decision not to hold discussions was reasonable because J & J represented the best overall value to the Government, with the lowest evaluated cost and highest quality proposal. In light of the initial evaluation results, contends defendant, it was reasonable for the Army to award the contract without discussions. We do not agree.

The court acknowledges that the RFP here properly notified all offerors of the Government's intent to award without discussions. Further, it is clear that, pursuant to regulations, a contracting agency retains discretion in determining whether or not to hold discussions in a particular procurement. However, we find equally evident, as persuasively set forth by the GAO in *The Jonathan Corporation,* that:

> [Such] discretion is not unfettered. Rather, the decision that discussions are not necessary must be reasonably based on the particular circumstances of the procurement, including consideration of the proposals received and the basis for the selection decision.

*The Jonathan Corp.,* B–251698.3, 93–2 Comptroller Gen.'s Procurement Decisions (Fed. Publications Inc.) ¶ 174, at 14 (May 17, 1993). Thus, the court is mindful that peculiar circumstances may arise which warrant an *exception* to the general rule that courts should respect the acts of procuring officials when said officials exercise their discretionary functions. This is such a case.

We begin by noting that our analysis here relies heavily on the GAO's decision in *Jonathan,* 93–2 Comptroller Gen.'s Procurement Decisions (Fed. Publications Inc.) ¶ 174. At issue there was a service contract for certain Navy amphibious ships. The RFP, as here, notified bidders of the Navy's intent to award *without* discussions. The Navy in fact did

award decision. However, for the reasons stated *supra,* the CO clearly was not in a decision-making position. Therefore, we do not consider her testimony with respect to this issue to be persuasive.

make an award to the lowest evaluated cost offeror, *without* conducting discussions. Yet, the disappointed bidders claimed that the Navy's determination not to hold discussions was unreasonable in light of the nature and magnitude of the cost adjustments made in connection with the Navy's cost realism analysis.

The GAO agreed with the protestors. More specifically, it acknowledged that the preparation of "discussion questions" do not, in and of themselves, require the agency to conduct discussions. Nonetheless, according to the GAO, the Navy had abused its discretion when it decided not to conduct discussions, given the substantial disparity between the Government's undisclosed estimate and that of the offerors, in addition to the Navy's numerous questions concerning the cost proposals. While this court recognizes that there are some factual distinctions, the circumstances surrounding the present procurement mirror, in all material particulars, those presented in *Jonathan* and, consequently, we embrace the GAO's persuasive reasoning and apply it here.

In this instance, there are several facts which bring into question the propriety of the Army's decision not to conduct discussions. Foremost, as stated previously, the Army supports its decision not to engage in discussions because J & J presented the lowest evaluated cost proposal and outranked all other offerors in the remaining two award factors, *i.e.,* quality and past performance. The record clearly indicates that this assessment was made *after* the Government's cost analyst, Ms. Nixon, completed her cost realism analysis, for purposes of which she created DX 1, for identification, the primary work papers, to compute the MPCE for DZS's proposal. Thus, it logically follows that the Army's reasoning was premised, in large part, on the assumption that the cost adjustment of approximately $2.4 million to DZS's proposal was supportable and based upon a reasoned analysis.

However, as discussed at length, *supra,* the defendant curiously failed to properly and timely include in the administrative record DX 1, for identification, a document which counsel for defendant admits is relevant, and we find to be critically so. Moreover, defendant also failed to include said document as part of its exhibit list for purposes of the hearing. Instead of producing DX 1, for identification, which it had in its possession, the defendant purposefully chose to secrete the information contained therein and to adduce any and all probative evidence through the "measured" testimony of Ms. Nixon. For all these reasons, as discussed previously, the court is constrained to infer that DX 1, for identification, would *not* support the cost adjustment made to DZS's proposal. Thus, in light of the court's earlier finding that the MPCE for DZS's proposal is not sustainable, it is not clear on this record, and we cannot find, that J & J *now* represents the best value to the Government.

Moreover, against this background we further find that the record evidences comparable facts to those presented in *Jonathan,* which compelled the GAO there to conclude that the Navy abused its discretion when it failed to enter into discussions. Specifically, the facts at bar indicate that DZS's proposal, in certain instances, deviated substantially from the undisclosed Government estimate, and that relevant issues for discussion were identified by the evaluators which could have materially altered the preliminary evaluation results. In such circumstances, "the contracting agency should consider the possibility that the proposal[ ] may, nevertheless, be advantageous to the [G]overnment and conduct discussions with the offeror[ ] concerning the discrepancy." *Id.* (citations omitted).

Here, the Army formulated its own estimate of the staff hours, or "man years," required to complete the work contemplated by the Solicitation. The offerors' proposals were compared to the Government's independent cost estimate (IGCE) [17] when evaluating

---

17. A point of clarification is warranted here, as the acronyms "IGE" and "IGCE" are used interchangeably throughout the record. The IGCE is the independent government cost estimate, of which there is only one. To arrive at the IGCE,

the Government estimated the staff-hours/man years required to complete the work contemplated by the Solicitation, *i.e.,* the independent government estimate (IGE). Consequently, the IGE is part of the IGCE. The evaluators did not

both the cost and quality award factors. If there were differences, the Technical and Management Committees resolved them, apparently by examining the proposals and determining whether the offeror's approach was reasonable. The record indicates that the Technical Committee, charged with the duty of reviewing the technical proposals in connection with evaluating the quality and cost factors, raised some concerns that directly pertained to the discrepancy between the Government's estimate of man years and that which DZS proposed. Specifically, the Technical Committee identified several "deficiencies" with respect to DZS's "technical staffing" proposal in the following labor categories: plumbers, general maintenance workers, electricians, painters, and administrative personnel.[18] These deficiencies were identified in addition to a clarification request by the technical evaluators regarding DZS's

proposed use of drywall finishers to accomplish the painting requirements set forth in the RFP.[19] Both deficiencies and clarifications, according to the SSP itself, are appropriately addressed during written or oral discussion.[20] Hence, concerns with respect to DZS's staffing proposal evidently could have been brought to DZS's attention if the Army had made a decision to conduct discussions. On analogous facts, the GAO in *Jonathan* agreed that "it was unreasonable for the [agency] to fail to hold discussions concerning the cost proposals, given the nature, magnitude and method of the adjustments made to each offeror's costs." *Id.*

Additionally, the administrative record reveals the significance of these perceived inadequacies in staffing upon the selection process. With respect to the quality award factor, the SSP indicates that one subfactor taken into consideration was "technical staff-

---

compare proposed costs to the Government's estimate of cost. Rather, as Ms. Cheryl Nixon explained on direct examination:

> The only thing that we use the government estimate for is the resources that make up that cost. The labor categories, the man years for each labor category and the types and quantities of equipment.

Tr. 828. The following exchange between defendant's counsel and Ms. Nixon on direct examination further explains the role of the IGCE in the present procurement:

> Counsel for the defendant:
> Q: [W]hat were other uses of the independent government cost estimates [IGCE] in this particular procurement?
> A: What we used it for in the evaluation process was as to the estimated labor categories that would be required to met the minimum requirement[s] ... in addition to [the] labor that would be required....

Tr. 832–33. Accordingly, the IGCE was used in the evaluation process, in relevant part, to compare the staff-hours proposed with those estimated by the Government.

18. JX 1, Vol. 6, Tab H/6 at III–10 (deficiency concerns for DZS's proposal identified by Glen Tingler); JX 1, Vol. 6, Tab H/6 at III–27 (identified deficiencies in overall assessment of DZS's technical proposal).

19. DZS's proposal states that: "The painting service section is staffed with 8 painters and 12 drywall finishers who will accomplish both interior and exterior painting ordered by the government." JX 1, Vol. 6, Tab 5 at III–203. While the court, giving ordinary words their ordinary meaning, is constrained to find such a statement to be anything *other than* clear, the technical

evaluators, on the other hand, requested a "clarification" as to whether drywall finishers would in fact paint. The record indicates that this clarification request was never brought to the attention of DZS.

The court notes that plaintiff, in addition to challenging the Army's failure to hold discussions, alleges that both the SSP and the Solicitation contemplated that the CO would communicate any and all "clarifications" sought by the evaluators to the offerors, regardless of whether discussions were conducted. Accordingly, plaintiff claims that the Army's failure to communicate the requested clarification as to its proposal was unreasonable. Conversely, the Army contends that the clarification sought as to the proposed use of drywall finishers was not a "clarification" as defined by the relevant FARs. *See* 48 C.F.R. § 15.601 (1996). Rather, defendant avers that, had the clarification at issue been communicated to DZS, such action would have invited a substantive response, *i.e.*, a "discussion." This in turn, avers defendant, would have triggered an obligation to conduct discussions with all offerors, which the Army clearly sought to avoid. *See* 48 C.F.R. § 15.610(b) (1996).

The court finds that plaintiff's allegation with respect to the Army's failure to communicate clarifications is essentially moot, because we find, *infra*, that the Army must conduct discussions.

20. We refer to the SSP wherein its provides that "[d]iscussions with offerors for the purpose of obtaining *clarifications* and correcting *deficiencies* in their proposals are conducted by the [c]ontracting [o]fficer." JX 1, Vol. 3, Tab E at II–7 (emphasis added).

ing." [21] The evaluation records suggest that the Technical Committee's belief that DZS insufficiently staffed its proposal to perform the work contemplated by the RFP led to a relatively low "technical staffing" score, as opposed to the other scores DZS received in connection with its quality evaluation. Consequently, it is appears that these presumed deficiencies significantly tainted plaintiff's overall quality rating. Furthermore, the cost analyst's narrative report, established after completion of the cost realism analysis, indicates that the adjustments to DZS's proposed cost were due in large measure to the Army's belief that DZS had under-staffed certain labor categories and over-staffed others.[22] In fact, of the approximately $2.4 million adjustment, $1.5 million is directly traceable to adjustments for "direct labor." [23] Thus, the perception is that the assessment of DZS's staffing proposal adversely impacted two of the three award factors, *i.e.*, cost and quality.

Having examined the evaluation process, the issues identified by the evaluators, and the significance of such issues on the selection process, we now take a closer look at the IGCE. There is little doubt that the IGCE was used as a standard, *i.e.*, a benchmark, against which the proposals were compared. The record further indicates that this so-called benchmark, *i.e.*, the IGCE, as in *Jonathan*, was not disclosed to the offerors. Moreover, there is some evidence that calls into question the accuracy of the IGCE. Specifically, the evidence to which we refer stems initially from a document in the administrative record, entitled "Combined Pre–Negotiation Objective Memorandum (POM) and Price Negotiation Memorandum (PNM)," [24] dated November 8, 1996, and signed by, among others, the CO, Ms. Chapman. Said memorandum states the following:

> It should be noted, however, that the IGCE *does not appear to be based on work-load data as presented as an exhibit to the solicitation and cannot be validated as completely accurate* based on the rationale provided for numerous parts of the estimate.

JX 1, Vol. 8, Tab L at 13–14 (emphasis added). In addition, the record reflects that both the CO, *and* Mr. Tingler, the technical evaluator, confirmed the validity of the foregoing statement.[25] Thus, on this record, it seems as if the accuracy of the IGCE, *i.e.*, the standard against which proposals were compared, is suspect.

The court is careful to note that there is nothing on this record to suggest that either the evaluators,[26] the SSAC, or the SSA were aware of the inaccuracy associated with the IGCE, as suggested in the aforementioned memorandum dated November 8, 1996, prior to the SSA's award decision, which was made on October 29, 1996. JX 1, Vol. 8, Tab K at

---

21. Technical Staffing amounted to 25% of the technical subfactor. JX 1, Vol. 8, Tab J at 35.

22. *See* JX 1, Vol. VII, Tab H/10, at Bugs Bunny 2 (Cost Committee report referring to problems with DZS's proposed staffing in certain labor categories).

23. *See* Defendant's Post Trial Proposed Findings of Fact, filed March 17, 1997, at 25 ("[A]pproximately $1.5 million [of the cost adjustment to DZS's proposal] was a result of escalation of direct labor rates due to inadequate staffing and other labor related concerns raised by the technical and cost evaluations.").

24. From the record, it appears as if the purpose of said memorandum was to gain approval for the SSA's determination to award without discussions from the principal assistant responsible for contracting FORSCOM, *i.e.*, higher headquarters. Tr. 242–44, 349–52.

25. The CO, when questioned on direct examination by plaintiff's counsel as to the validity of the statement at issue, testified as follows:

 Counsel for plaintiff:
 Q: [T]he IGCE was part of the basis on which the decision was made, correct? Yes or no ma'am?
 A: It is used as a benchmark, yes.

 &ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;

 Q: The [G]overnment used as a benchmark a standard it knew to be inaccurate.
 A: Yes.
 Tr. 252. Moreover, Mr. Tingler, on cross-examination by plaintiff's counsel, testified that he agreed with the statement at issue in the "Combined Pre–Negotiation Objective Memorandum (POM) and Price Negotiation Memorandum (PNM)." Tr. 761–62.

26. Mr. Tingler testified on the record that: "This statement[, regarding the inaccuracy of the IGCE,] was not available during the evaluation." Tr. 762.

15. Nevertheless, there is also nothing on the record before us to indicate that the decision-makers, *i.e.*, the SSAC or the SSA, re-evaluated their initial award decision, or their decision not to conduct discussions, upon notice of the IGCE's questionable accuracy, prior to the Army's contractual award to J & J on December 6, 1996. JX 1, Vol. 9, Tab O at 1. Consequently, we find that the foregoing facts call into question the propriety of awarding a contract without first addressing relevant issues, which could have explained the disparity [27] between DZS's proposal and the undisclosed and apparently inaccurate IGCE.

Yet despite this, the Army ultimately decided not to conduct discussions *solely* because J & J outranked all offerors in all three award factors. At first blush, such a statement would seem to be sufficient justification for the Army's definitive actions. However, as noted previously, this justification is suspect, because defendant's curious conduct at trial, resulting in the court's finding that DZS's MPCE is not sustainable on this record, brings into substantial doubt any award decision premised upon DX 1, for identification, and the MPCE purportedly computed therefrom.

Furthermore, upon a careful review of the Army's evaluation results, it is patently clear that DZS, in fact, was a *very close* second to J & J. More specifically, the MPCE for J & J's proposal was only $432,361 less than DZS's evaluated cost, and J & J's quality rating was merely 2.42 points higher than that of DZS's proposal. Had J & J enjoyed a significant advantage over DZS, our conclusion might be different. But, on this record, that is not a fact. Rather, in light of the small margin, the undisclosed Government estimate, and the discussible issues identified by the evaluators, we find that, had the Army brought the evaluators' concerns to DZS's attention, it "would have generated answers which could have significantly changed the nature and extent of the cost adjustments [and the quality ratings made by the Army] and therefore could have changed the outcome of the procurement." *Jonathan*, 93–2 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) at 14. Thus, given the totality of the circumstances here at bar, there is no reasonable justification for the Army's failure to conduct discussions, and, as a consequence, we are compelled to find that the Army abused its discretion when it so decided.

### 1. Prejudice

■■■ The intervenor cites to *Data Gen. Corp. v. Johnson*, 78 F.3d 1556 (Fed.Cir. 1996), to support its assertion that DZS has not shown that it was prejudiced by the Army's decision not to hold discussions. In *Data Gen.*, *after* the contracting agency had conducted discussions and received BAFOs, it made a subsequent communication to *an* offeror, who ultimately was awarded the contract. The disappointed bidder alleged, in part, that this post-BAFO unilateral communication was a "discussion" and not merely a "clarification," and that, therefore, the agency should have reopened discussions. Although on appeal it did not address whether the communication was a clarification or a discussion, the Federal Circuit upheld the award because it found that the plaintiff had not demonstrated prejudice. Specifically, according to the court, the disappointed bidder was not prejudiced by the alleged failure to reopen discussions, because there was no showing that it could have improved its proposal in any way to compete more effectively with the successful bidder. *Id.* at 1563.

The issue at bar, however, is distinguishable from that addressed by the Federal Circuit, in that, as discussed *supra*, the court has found that the Army in fact abused its discretion when it failed to conduct discussions, because a significant reason upon which it premised its decision, *i.e.*, the MPCE for DZS's proposal, is not supported by the record. Furthermore, the factual circumstances surrounding the present procurement indicate that, without discussions, the Army could not make a reasoned evaluation

---

27. The record indicates that the cost variance between the initial proposed cost and the MPCE for each proposal ranged from as little as 1.15% to as much as 20.80%. The cost variance for DZS's proposal was 6.27%, whereas J & J's proposal had a variance of 4.79%. JX 1, Vol. 8, Tab J at 39 (briefing chart depicting summary of cost evaluation).

as to which proposal presented the best value to the Government. Clearly, the Federal Circuit in *Data Gen.* did not confront such a situation, as here at bar. *See Keco Indus. Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200 (1974) (finding that arbitrary and capricious conduct may be shown by "proof that there was 'no reasonable basis' for the administrative decision...." (citations omitted)). Lastly, the Army's unjustified determination not to hold discussions, coupled with its conduct during trial with respect to its failure to timely produce DX 1, for identification, compels this court to embrace the following persuasive language in *Jonathan:*

> Where ... an agency clearly violates procurement requirements, we will resolve *any* doubts concerning the prejudicial effect of the agency's action in favor of the protestor.

93–2 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) at 16 (citations omitted). The foregoing language is pertinent on "all-fours" to the instant case and effectively makes the point. This court embraces the same compelling logic in disposing of the prejudice issue at bar.

### C. Past Performance Evaluation

Plaintiff also contends that the Army's past performance evaluations of J & J and DZS provide no rational basis for favoring one over the other. Further, plaintiff charges that the Army acted unreasonably when it failed to take into consideration DZS's nomination in October of 1996, by Ft. Bragg, for the 1996 Directorate of Engineering and Housing/Directorate of Public Works Contractor of the Year award. Upon careful review of the record before this court, we find that the past performance evaluations were rational and not arbitrary or capricious.

We begin by noting that the contracting agency retains considerable discretion when determining the source and type of information taken under consideration to evaluate past performance. *See* 48 C.F.R. § 15.608(a)(2)(ii) (1996).[28] In this instance, the RFP notified bidders that:

Past performance will be evaluated utilizing the information obtained from past performance records furnished with the proposal, information received in response to past performance surveys, other customers known to the Government, consumer protection organizations, and others who may have useful and relev[a]nt information. Offerors are reminded that while the Government *may* elect to consider data obtained from other sources, the *burden* of providing thorough and complete past performance information *rests with the offerors.*

JX 1, Vol. 2, Tab D at M–3 (emphasis added). Additionally, the Solicitation instructed offerors to identify all contracts they had performed within the last three years and contacts to whom surveys should be sent. Consistent with the RFP's evaluation scheme, the evaluation documents reveal that the Army did in fact evaluate past performance *primarily* on the surveys received regarding the offerors' previous contracts. Survey responses were then aggregated and resulted in an adjectival rating. J & J received an overall "exceptional" rating, whereas DZS received an "outstanding" evaluation.

Having reviewed the administrative record, we find that the survey results contained therein support the Army's conclusion. Specifically, the surveys indicate that J & J received mostly exceptional marks for its work on previous contracts, whereas DZS received some exceptional, but mostly outstanding, ratings. Further, the survey responses, including a response received from Ft. Bragg, identified several "weaknesses" with respect to DZS's previous contract performance. Thus, given the record before us, we hold that there was a rational basis for the Army's determination that J & J's past performance warranted a higher rating than that for DZS.

■ Moreover, we do not find that the Army acted unreasonably when it allegedly failed to take into consideration DZS's nomination for Contractor of the Year. The RFP itself explicitly warns offerors that the onus

---

**28.** 48 C.F.R. § 15.608(a)(2)(ii) (1996) states in relevant part: "The source and type of past performance information to be included in the eval-

uation is within the broad discretion of agency acquisition officials and should be tailored to the circumstances of each acquisition." *Id.*

of providing additional past performance information, other than that specifically required, rested with the *offeror*, not the Army. DZS *never* brought its nomination to the attention of the Army during the evaluation process. In fact, the Army first learned of the nomination at the December 18, 1996 debriefing held for DZS, after the award decision and well after the past performance evaluation for DZS was completed on July 1, 1996. Our conclusion might have been different had the Army *purposefully* ignored such information; however, this is not such a case. Thus, we find that the Army evaluated the proposals in accordance with the method set forth in the RFP and did not act arbitrarily or capriciously with respect thereto.

Finally, even if we assume, *arguendo*, that the Army should have taken DZS's nomination into consideration, we find such error to be harmless. We first note that *J & J's* proposal clearly indicates that it has been *awarded* comparable honors. More importantly, however, the past performance evaluation records evidence that the Army relied heavily, if not exclusively, on the past performance surveys. Consequently, even if DZS's nomination was taken into account, there is nothing to support a finding that said nomination would have eclipsed the survey responses received in connection with DZS's previous contract performance, or the weaknesses noted therein. In other words, we cannot conclude that DZS's nomination *alone* would have changed the ultimate past performance evaluation results. In fact, plaintiff admits as much.

Accordingly, to the extent that the Army erred when it failed to táke into account DZS's nomination for Contractor of the Year, we hold that such error did not substantially prejudice plaintiff. *See Cubic*, 37 Fed. Cl. at 362.[29]

### III. *Injunctive Relief*

■ Having established that the MPCE for its proposal is not sustainable on this record, and that the Army abused its discretion when it failed to engage in discussions, plaintiff must make three additional showings, by clear and convincing evidence, of entitlement to injunctive relief: (1) that it will suffer specific irreparable injury if the procurement is not enjoined; (2) that granting the relief serves the public interest; and (3) that the harm to be suffered by it outweighs the harm to the Government and third parties. *Washington Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 842–43 (D.C.Cir.1977).

As for the first element, plaintiff has shown that, if a permanent injunction does not issue, it would be irreparably injured in the form of lost profits if the contract award to J & J is sustained. *TRW Envtl.*, 18 Cl.Ct. at 73 (finding it "perfectly erroneous to conclude ... that the loss of an opportunity to earn an award-fee profit of the magnitude contemplated by this contract is not an irreparable harm that plaintiff will suffer if injunctive relief is denied."). Further, we find that the public interest in protecting the integrity of the procurement system from unreasonable or irrational conduct and in ensuring that contracting agencies provide sufficient documentation to permit proper review of their actions is served by granting a permanent injunction. *See PCI/RCI v. United States*, 36 Fed. Cl. 761, 776 (1996). Lastly, the relative harm to defendant(s) is slight, if any, upon the grant of the injunction. Because the permanent injunction we issue is limited to requiring the Army to hold discus-

---

**29.** Plaintiff also challenges the Army's assessment of its "technical proposal," contending that the evaluators' ultimate conclusion that DZS "unrealistically" understaffed its proposal was arbitrary and capricious, because the Army unreasonably failed to take into consideration the methodology and resulting efficiency by which DZS proposed to complete the work contemplated by the RFP.

We have previously recognized that a court "should not substitute its judgment for that of an agency, especially in technical matters in which the judge lacks expertise." *TRW Envtl.*, 18 Cl.Ct. at 69 (citing *Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985)). Yet, on this record, the alleged conduct that plaintiff claims to be arbitrary and capricious "is squarely a matter of judgment. To accept plaintiff's argument would be to blatantly substitute the court's judgment for that of [the Army.]" *Id.* at 70. Hence, we conclude that plaintiff's contention falls short of establishing arbitrary and capricious conduct on the part of the Government and, accordingly, is rejected.

sions and to evaluate all ensuing BAFOs, if the intervenor in fact presents the best overall value to the Government, ultimately it will receive the award; and any delay caused by this injunction does not deprive the Army of service at Ft. Bragg, as the incumbent, DZS, who received its nomination for Contractor of the Year for its performance *at* Ft. Bragg, will continue to provide these services until such time as an award is made in accordance with our ruling. The court's action here only corrects the Army's intentional violation of statute and regulation and its unreasonable determination not to conduct discussions, and requires it to do no more than what it should have done *ab initio*. *See id.*

### CONCLUSION

Wherefore, consistent with the above, it is hereby ordered that the plaintiff's motion for permanent injunctive relief is GRANTED as follows:

The United States Department of Army's award of the contract under RFP DAKF40–95–R–0006 to the intervenor, J & J, is hereby enjoined, cancelled, and set aside. The Army is further enjoined from awarding a contract under RFP DAKF40–95–R–0006 unless and until such time as discussions are held with DZS, in addition to any other offerors the Army deems appropriate upon consideration of the applicable rules and regulations, and any ensuing BAFOs are fully and fairly evaluated.

It should be emphasized that nothing in this opinion may be construed to suggest that plaintiff is, in fact or in law, entitled to the award of the subject contract.

IT IS SO ORDERED.