**RIG MASTERS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 05–1277C.

United States Court of Federal Claims.

April 14, 2006.[1]

1. We filed an Opinion under seal on April 4, 2006, and asked the parties to identify material they sought to protect. This Opinion incorporates the parties' proposed redactions. The material we deleted is denoted with brackets [].

Cyrus E. Phillips, IV, Washington, D.C., for plaintiff.

Timothy P. McIlmail, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

## ORDER AND OPINION

HODGES, Judge.

The United States Army Corps of Engineers solicited a contract for the operation and management of recreational facilities at four lake sites in Mississippi. Plaintiff Rig Masters protested the Corps' decision to award the contract to another party, Ferguson–Williams, contending that the award was arbitrary and capricious and violated applicable procurement law. The issue is whether the Government had an obligation to engage in discussions with Rig Masters concerning the shortcomings in its offer.

The Government responds with the observation that all bidders knew the Corps intended to award the contract to the best value offeror on initial proposals. *See, e.g.,* Administrative Record 1990 ("The Government intends to evaluate proposals and make [an] award without discussions."). The Corps of Engineers conducted this procurement lawfully. We deny plaintiff's motion for judgment on the Administrative Record for the reasons discussed below. Defendant's cross-motion is granted.

## THE SOLICITATION

The Corps of Engineers is responsible for the operation, maintenance, repair, inspection, reconstruction, and rehabilitation of certain recreational facilities in Northern Mississippi. These facilities are located at Lakes Grenada, Enid, Sardis, and Arkabutla. The Corps issued a Solicitation for Competitive Proposals for a contractor that would carry out these duties for one year, with four single-year options. The Corps restricted the procurement to small businesses.

The April 8, 2005 Solicitation contemplated a "fee consisting of a base amount fixed at the inception of the contract and an award amount that the Contractor may earn in whole or in part during performance and that is sufficient to provide motivation for excellence in such areas as quality, timeliness, technical ingenuity, and cost-effective management." AR 1790. Offerors were to propose an estimated cost for each year of the five-year term, with a base fee not to exceed three percent of total estimated costs. AR 1787. They also could include an award fee of up to seven percent of total costs for each year. *Id.* Fee award determinations were "made solely at the discretion of the Government." AR 1790.

The Government alerted bidders that they would "provide many operations, maintenance, and repair activities." *Id.* A role of the contractor would be "maximiz[ing] the effectiveness of ... overall operations while minimizing costs to the Government." *Id.* The Solicitation called for interested parties to "propose cost-effective methods, plans, and resources that will increase efficiency and maximize performance." *Id.*

Staffing was important to the Corps of Engineers. Bidders' proposals were to "provide staffing and work plans to efficiently accomplish inspection, operation, maintenance, reconstruction, repair, and rehabilitation of project facilities and features." AR 1810. The Contractor had to be "capable of transporting and otherwise making all proposed manpower resources available at any location contained in the scope of this con-

tract; i.e., by providing a sufficient number of vehicles, boats, etc., to facilitate the [Operation and Maintenance] activities." *Id.* Proposals were to demonstrate that each person staffed under the contract possessed a minimum level of skill and experience. AR 1810–11.

Equipment requirements were similarly crucial. The proposals were to include the equipment that the contractor intended to use at the lakes. The equipment would "efficiently accomplish inspection, operation, maintenance, reconstruction, repair, and rehabilitation of project facilities and features[,]" considering the scope of the contract work. AR 1811.

Section L of the Solicitation instructed interested parties how to prepare their bids. The proposals were to include Technical and Management Capability and Cost components. AR 1976. While the Solicitation contained forms that bidders could use to support their proposals, the instructions noted that "other information required herein and any additional information that you feel will be supportive of your proposal may be submitted separately." *Id.* The Solicitation informed offerors that it was their "responsibility to ensure the completeness and accuracy of [their] proposal." *Id.*

## INITIAL PROPOSALS

The Corps received seven proposals at the June 22, 2005 closing date, including those of plaintiff Rig Masters and awardee Ferguson–Williams. Their bids contained technical proposals, past performance criteria, and projected costs.

Rig Masters' technical proposal included an annual staffing plan and a list of the contractor-furnished equipment for each of the four lake sites. AR 227–35. Rig Masters proposed [ ] fee clerks at Arkabutla Lake, [ ] fee clerk at Enid Lake, [ ] fee clerks at Grenada Lake, and [ ] fee clerks at Sardis Lake. AR 227–30. It planned to use [ ] pieces of equipment at Arkabutla Lake, Enid Lake, and Grenada Lake, and [ ] pieces at Sardis Lake. AR 232–35. Plaintiff offered a base contract year cost of [ ], with a base fee of [ ] percent, or [ ]. AR 862. The award fee of [ ] percent added [ ]. *Id.* Rig Masters'

proposed contract cost for the base year and the four option years was [ ]. AR 98; 865.

Ferguson proposed using [ ] park attendant aides/fee clerks at Arkabutla Lake, [ ] at Sardis Lake, [ ] at Enid Lake, and [ ] at Grenada Lake. AR 1202–05. It would furnish [ ] pieces of equipment at Arkabutla Lake, [ ] at Enid Lake, [ ] at Grenada Lake, and [ ] at Sardis Lake. AR 1209–12. Ferguson's total estimated cost for the base contract year was [ ], with a base fee of [ ] percent and an award fee of [ ] percent. This was a total contract cost of [ ] for the base year and the four single-year options. AR 98; 1359.

## THE CONTRACTING OFFICER'S EVALUATION

Section M of the Solicitation outlined the factors the Corps of Engineers would consider in its evaluation. AR 1990. Section M.3 stated:

*Evaluation and Selection Procedures.* Selection of a Contractor will be made by an integrated assessment of the proposals submitted and in light of the following criteria. The integrated assessment will involve a determination by the Government of the overall merit of each offeror's proposal, *recognizing that subjective judgment on the part of the Government evaluators is implicit in the entire process.*

All offeror's proposals will be evaluated for technical quality and quantity and assigned an adjectival rating based upon the criteria set forth herein.

A cost realism analysis will be performed.

Award will be made to the offeror whom the Government determines will be able to accomplish the necessary work in the manner most advantageous to the Government and who's offer represents the best value to the Government, after considering all factors, including estimated cost. The evaluation of technical capabilities will be accomplished without reference to cost.

Technical Capability is more important than Past Performance. Past Performance is more important than Cost. All evaluation factors other than cost or price,

when combined, are significantly more important than cost or price.

. . .

The offeror must demonstrate the equipment capability required by the contract. The offeror must demonstrate that he/she has sufficient numbers of personnel and sufficient skill diversity to accomplish the requirements of the contract.

*Id.*

## BEST VALUE CONTRACT

The Government would not award the contract necessarily to the lowest price offeror in this best value procurement; it would consider price and other factors to obtain the best overall value to the Government. The three principal areas of evaluation were technical capability, past performance, and cost. The Corps would also rate proposals on five technical subfactors, listed in descending order of importance: (1) management capability; (2) experience and technical expertise of key personnel; (3) equipment; (4) staffing;

2. The Source Selection Evaluation Plan defined the Committee's responsibilities as follows:

> The Technical Evaluation Committee will evaluate the offerors' written technical proposals. The Technical Evaluation Committee will also assist the contract specialist and contracting officer in performing a crosswalk of the technical proposals and cost proposals in order to determine the probable cost of performance for each offer. All Committee members will be scoring/voting members.
> [The Past Performance and Cost Evaluation Committee] will be responsible for evaluating past performance and cost. All members will be scoring/voting members for past performance. Cost will not be rated. During cost proposal evaluation, if required, DCAA will assist by providing audit information on offerors. In addition to performing price reasonableness analyses, the responsibilities of this Committee include performing cost realism analyses to determine the probable cost of performance for each offer, monitoring the progress of the Technical Evaluation Committee, and lending administrative assistance on issues of evaluation as related to this plan.
> AR 200.

3. Outstanding: The proposal far exceeds the requirements of the Solicitation. The offeror has convincingly demonstrated that the requirements have been analyzed, evaluated, and synthesized into approaches, plans, and techniques that when implemented will result in effective and efficient performance. The proposal has major

and (5) proposed budgetary and cost accounting systems. AR 207. The Corps would assess the proposals "based on the degree to which the proposal meets the minimum requirements specified in the solicitation." AR 203.

The contracting officer was the person responsible for deciding which proposal offered the best value to the Government and for making the final selection of a contractor. AR 199–200. The Corps' Source Selection Evaluation Plan prescribed the methods by which the contracting officer was to conduct the procurement. Two committees initially reviewed the proposals, the Technical Evaluation Committee and the Past Performance and Cost Evaluation Committee.[2] *Id.* Each evaluator individually reviewed and evaluated the proposals, and then the technical reviewers derived a single consensus rating. AR 201. Each bidder was given an adjectival rating of Outstanding, Good, Satisfactory, or Unacceptable, following the technical evaluations.[3]

strengths which indicate exceptional features or innovations that will substantially benefit the program. There are no major weaknesses.... The personnel proposed by the offeror far exceed the education, training, and experience necessary to perform the work as proposed. The proposed technical approach contains no risks or few risks for which alternatives are identified and considered achievable....

Good: The proposal exceeds the requirements of the Solicitation. The offeror has demonstrated that the requirements have been analyzed, evaluated, and synthesized into approaches, plans and techniques that when implemented should result in effective and efficient performance. The proposal has major strengths and/or several minor strengths which indicate a proposal approach that will benefit the program. There are a few weaknesses, but they are more than offset by strengths. The personnel proposed by the offeror exceed the education, training, and experience necessary to perform the work as proposed. The proposed technical approach contains no risks or few minor to moderate risks for which alternatives are identified and considered achievable....

Satisfactory: The proposal meets the requirements of the Solicitation. The proposal demonstrates a generally adequate, but not always in-depth, understanding of the required effort. The proposal has few, if any, strengths. Weaknesses exist which are offset by strengths. The personnel proposed by the offeror generally have the minimum required education, training and ex-

Risk also was an evaluation factor in the Government's assessment of the proposals. The contracting officer aimed to strike a balance between a level of risk that was manageable and acceptable against a fair and reasonable contract price in evaluating proposals. The Source Selection Evaluation Plan identified two types of risk, Technical Proposal Risk and Performance Risk. AR 204.

Technical Proposal Risk is "risk associated with an offeror's proposed approach for accomplishing the [Solicitation] requirements." *Id.* The Corps evaluated each proposal and gave them adjectival ratings of "Low," "Moderate," or "High" Technical Proposal Risk. AR 204-05. A low risk proposal presented "little potential to cause disruption of schedule, increase in cost, or degradation of performance." AR 205. A proposal with moderate risk possessed "weaknesses that can potentially" disrupt the schedule, increase the cost or degrade performance. *Id.* "[S]pecial contractor emphasis and close Government monitoring" probably would minimize any difficulties, however. *Id.* A high risk rating meant that the proposal demonstrated weaknesses with potential to cause "serious disruption of schedule, increase in cost or degradation of performance even with special contractor emphasis and close Government monitoring." *Id.*

Performance Risk addressed a bidder's likelihood of "successfully completing the solicitation requirements based on the offeror's performance record on same or similar contract efforts." AR 204. This assessment contemplated that risk "associated with an offeror's likelihood of success" in performing the requirements stated in the Solicitation. *Id.* The Government would evaluate an offeror's Performance Risk based on its past performance. *Id.* Performance Risk ratings

were classified as "low," "moderate," "high," or "unknown—no relevant performance record identifiable." AR 205. Low risk meant there was "essentially no doubt" that the bidder would successfully perform. *Id.* Moderate risk conveyed "some doubt," while high risk indicated the agency had "extreme doubt" whether the offeror could perform the stated requirements. *Id.* A rating of unknown risk meant that the evaluators lacked information upon which to base a meaningful performance prediction. *Id.* Either the contracting officer could not identify any relevant experience, or the offeror may have had no past performance record at all.

The evaluators used a Technical Evaluation Rating Sheet to identify any strengths, deficiencies, or weaknesses in the individual proposals. AR 206. A "strength" is any part of the proposal, except for cost, that "appreciably decreases the risk of unsuccessful contract performance or that represents a significant benefit to the Government." *Id.* A "deficiency" in a proposal materially fails to meet a Government requirement. *Id.* Deficiencies also may be "a combination of weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." *Id.* A proposal "weakness" is a flaw that "increases the risk of unsuccessful contract performance." *Id.* A weakness is "significant" if it "appreciably increases the risk of unsuccessful performance." *Id.* The contracting officer would not compare a proposal against all others. AR 201. Rather, she would assess each bidder on its own merits. *Id.* She would measure all proposals against the criteria in the Source Selection Evaluation Plan and the Solicitation. *Id.*

**EVALUATION AND AWARD**

The evaluation team began its review of the proposals on June 27, using the proce-

pertise necessary to perform the work as proposed. The proposed technical approach contains some moderate to major risks for which alternatives are identified and considered achievable. . . .

Unacceptable: The proposal does not meet the stated minimum requirements of the Solicitation. The offeror's understanding of the Government's requirements is so superficial, incomplete, incompatible, or incorrect as to require a virtually new proposal effort in order to be acceptable.

The proposal has very few, if any, strengths. The proposal has major weaknesses and/or many minor weaknesses that are not offset by strengths. The personnel proposed by the offeror do not have the education, training, or experience necessary to perform the work as proposed. The proposed technical approach contains significant risks for which alternatives are not identified or alternatives identified are not considered achievable. AR 203–04.

dures outlined in the Source Selection Evaluation Plan. The team found that five proposals contained staffing and equipment shortages after evaluations. AR 92–94. These included Rig Masters' offer. Each would require revisions before an award could be made to it. *Id.* Four of the five proposals, including Rig Masters', received ratings of [ ] in the Equipment or Staffing Subfactors, or both. AR 96.

Rig Masters received [ ] ratings in both technical subfactors. Rig Masters' rating for equipment was considered [ ]—They proposed using [ ]; however the proposed vehicle numbers are insufficient [ ]. AR 99. The suggested equipment list the Corps had provided in the Solicitation included fifty-three vehicles: eight at Enid Lake, twelve at Grenada Lake, thirteen at Arkabutla Lake, and twenty at Sardis Lake. AR 1742–49. Rig Masters by comparison proposed using a total of [ ] vehicles. AR 232–35. Rig Masters' [ ] score with respect to staffing stated that "[p]roposed [ ] will cause inefficiencies in performance." AR 99. Such deficiencies caused the Corps to consider Rig Masters' Technical Proposal Risk [ ] overall. The Corps felt "Rig Masters' lack of proposed sufficient personnel and equipment has the potential to cause some disruption of schedule or degradation of performance." AR 100. The agency also felt Rig Masters' Performance Risk was [ ]. The Corps noted that Rig Masters had not handled contracts as large or complex as this one. AR 100. It found Rig Masters' "past performance record [wa]s [ ], [but] previously performed contracts were smaller in size with limited relevancy" to this project. AR 92. The Government also noted that "the smaller size of prior and current contracts and the relevance of the scopes of those contracts introduces some doubt that they will successfully perform the required effort." AR 100.

Ferguson had a past performance consensus rating of [ ]. AR 100–01. The Corps thought Ferguson's technical proposal risk and performance risk were [ ]. The agency noted that Ferguson's "[p]roposal demonstrates that [its] experience and understanding of the requirements should provide [ ] risk of disruption of schedule or degradation

of performance." AR 101. Ferguson's proposal "indicated [ ] they will successfully perform the required effort." *Id.*

The agency evaluated cost proposals for reasonableness according to standard cost/price analysis techniques and cost realism analyses. Rig Masters' probable cost was the lowest at approximately [ ]. Ferguson had the second-lowest at about [ ]. The Government Control Estimate for the Mississippi Lakes contract for all costs, fees, and allowances was [ ]. AR 189–93.

## NO DISCUSSIONS

FAR clause 52.215–1 incorporated into the Solicitation instructed offerors that the Government intended to issue the award without discussions. *See* 52.215–1(f)(4), Instructions to Offerors–Competitive Acquisition ("The Government intends to evaluate proposals and award a contract without discussions with offerors . . . ."). AR 1982–85. Contractors were on notice that their initial proposals should contain their best terms from a cost and technical standpoint, though the Government could conduct discussions if the contracting officer considered them to be necessary. *Id.;* AR 1990.

The contracting officer determined that she could not award the contract to Rig Masters without discussions. AR 92. Rig Masters had the lowest most probable cost, but the offer "contain[ed] staffing and equipment shortages that would require a probable revision" of the offer to meet the requirements of the Solicitation. *Id.* The contracting officer considered Ferguson–Williams a "potential candidate for award based on [its] initial proposal." AR 93. Just one other bidder, [ ], was a potential candidate based on its initial offer. *Id.* She selected Ferguson over other offerors because that was "in the best interests of the Government." AR 95.

The Corps selected Ferguson–Williams for award of the contract and notified other bidders on August 22. The contracting officer stated that her decision was based upon the factors and subfactors of the Solicitation and her integrated assessment and comparison of the relative strengths and weaknesses of each proposal, as well as their risks.

## ADDITIONAL PROCEEDINGS

Rig Masters protested Ferguson's small business status on August 26. AR 16. The Small Business Administration dismissed the protest on September 8, and reaffirmed the dismissal upon Rig Masters' request for reconsideration. *Id.* The Corps awarded the Contract to Ferguson–Williams on September 12. Rig Masters requested a debriefing, which the Corps conducted ten days later. *Id.* The agency explained the evaluation process and the deficiencies the contracting officer and her evaluation team considered fatal to Rig Masters' proposal. AR 41–43. The contracting officer discussed the fundamentals of the Solicitation, the selection criteria, and the bases for the Corps' decision. *Id.* A representative from Rig Masters asked why the contracting officer chose not to hold discussions. *Id.* She responded that discussions were optional and the Corps considered them to be unnecessary in this procurement. *Id.* The Corps stated that offerors could not count on discussions and that any discrepancies or deviations from standardized proposals should have been explained in the individual bids. *Id.*

Rig Masters filed a formal protest with the Corps of Engineers on October 3, asserting that its proposal offered the best value to the Government. Rig Masters also sought to explain its deficiencies in staffing and equipment. Plaintiff declared that while its staffing and equipment plans deviated from the standardized solicitation forms, Rig Masters was not required to explain such deviations. It also challenged its past performance rating, which it considered to be better than [ ].

The agency rejected plaintiff's objections. The Corps found that the "evaluation of Rig Masters' proposal was reasonable and in accordance with the evaluation criteria. Even comparing the difference in proposal price, a difference of about [ ] percent, the source selection official [i.e., the contracting officer] has wide discretion in making the cost/technical tradeoff." AR 2476. The Corps dismissed Rig Masters' agency-level protest, concluding that the contracting officer's "cost/technical trade-off was [not] irrational." *Id.* Plaintiff thereafter filed its Complaint with us.

## DISCUSSION

We have jurisdiction to entertain this post-award bid protest pursuant to 28 U.S.C. § 1491(b)(1) (granting judicial review to "an interested party objecting to ... the award of a contract ... in connection with a procurement"). Rig Masters is an "interested party" with standing to contest the outcome of the bid. *See Kropp Holdings, Inc. v. United States,* 63 Fed.Cl. 537, 549–50 (2005) ("We hold that standing under [28 U.S.C.] § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract.") (quoting *Am. Fed'n Gov't Employees, AFL–CIO v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001)).

Plaintiff contends that the contracting officer's decision not to hold discussions in these circumstances was unreasonable: (1) its ratings of "unacceptable" on the technical and staffing subfactors would have been higher if it could have explained its deficiencies during discussions; and (2) with the resulting higher ratings, plaintiff's bid was the best value to the Corps because it met the technical requirements and offered the lowest cost. Rig Masters believes that the award was based essentially on cost and that the Government therefore could not have considered Ferguson's proposal "the best value to the Government."

Defendant maintains that the award was reasonable. The contract was a best value procurement, which meant that the contracting officer had broad discretion in making her award. The Government disputes plaintiff's contention that cost was the primary basis for the award to Ferguson; it considered all of the relevant factors and gave due weight to those factors in accordance with the Solicitation. Cost was just one of three principal factors assessed by the contracting officer, and in fact it was the least important of the three.

Discussions were not warranted in this acquisition because the Corps believed it could select one of two qualified bidders based solely on their initial proposals. Defendant believes the decision to award the

contract to one of these finalists without further discussions reasonably was within the discretion of the contracting officer.

### A. Standard For Reviewing Record in Bid Protest Cases

■ We employ the standards of the Administrative Procedure Act when reviewing an agency's actions in a bid protest. 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4); *see, e.g., Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1329 (Fed.Cir.2004). A reviewing court will enjoin the Government's procurement actions only if the agency acts in an arbitrary or capricious manner, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard, by definition, acknowledges a "zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which 'consider[s] the relevant factors' and is 'within the bounds of reasoned decisionmaking.'" *JWK Int'l Corp. v. United States,* 52 Fed.Cl. 650, 654 n. 8 (2002) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)).

■ A reviewing court's role is limited in the procurement process. Courts should not interfere except "in extremely limited circumstances." *CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983). The aggrieved party must show either that the agency decision it is challenging was irrational or that it involved a clear violation of applicable procurement law. *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004). A plaintiff's challenge on the first ground requires the court to "determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1333 (Fed.Cir. 2001) (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994)). "[T]he disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* (citation omitted). A plaintiff bringing a challenge on the second ground must show that an error by the agency significantly prejudiced it to prevail. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1353 (Fed.Cir.2005); *see also Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999) (requiring for a showing of significant prejudice that the protestor demonstrate it had a "substantial chance" of receiving the contract award, absent the error).

"Indeed, a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still where, as here, the procurement is a 'best-value' procurement." *Banknote Corp. of Am., Inc. v. United States,* 56 Fed. Cl. 377, 380 (2003), *aff'd* 365 F.3d at 345. Courts afford agencies broad discretion because there is "a strong presumption that government officials act correctly, honestly, and in good faith when considering bids." *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 42 (1997). We cannot substitute our judgment for that of the agency if its decision is grounded in reason. Rather, we "must look to see whether the agency considered the relevant factors and made a rational determination." *Keeton Corrs., Inc. v. United States,* 59 Fed.Cl. 753, 755 (2004) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

### B. Award to Ferguson–Williams Was Not Arbitrary and Capricious

■ Plaintiff contends that the Corps' award to Ferguson was arbitrary and capricious because the contracting officer decided not to hold discussions. Discussions would have provided plaintiff the opportunity to explain some of the purported deficiencies in its proposal, and it would have explained the cost-saving mechanisms it used. Such mechanisms led to Rig Masters' deviations from the standardized aspects of the Solicitation, according to plaintiff.

FAR 15.306 says that an "[a]ward may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions." 48 C.F.R. § 15.306(a)(3). The Solicitation could not have been more clear that the Government intended to evaluate the proposals and award the contract without

discussions. Prospective bidders thus were on notice that the Government would issue the award without discussions if possible. Discussions were to occur only if the contracting officer deemed them necessary. She did not, and nothing in the record suggests that her decision in this regard was erroneous.

We are not faced with a procurement situation where the contracting officer had not received any acceptable initial proposals. The contracting officer decided she could award the contract to two offerors based on their initial proposals. She made the following conclusions about these two bidders:

> **Ferguson–Williams**–This vendor is a potential candidate for award based on their initial proposal. Ferguson–Williams' evaluated cost/most probable cost is [ ] than the government estimate. This vendor was rated [ ] in all technical sub-factors proposing sufficient staffing and equipment to perform the requirements of the RFP. Ferguson–Williams received a[ ] consensus technical rating. This vendor has 10 years onsite experience at MS Lakes—five years as a prime contractor and five years as a subcontractor to the incumbent contractor. Proposal risk is [ ]. Past performance is [ ] and performance risk is [ ].
>
> . . .
>
> [ ]–This vendor is a potential candidate for award based on their initial proposal. [ ]'s evaluated cost/most probable cost is [ ] than the government estimate and this vendor received the highest technical rating in each individual category and the highest overall technical rating when compared to the other six offerors. [ ]'s consensus technical rating is [ ]. Proposal risk is [ ]. This is a newly formed company. The company itself has no recent or relevant experience, however, the principals for the company have been successfully performing as employees under the current contract and received a consensus past performance rating of [ ]. Performance risk is [ ].

AR 93.

The contracting officer and her evaluation team performed extensive assessments of all proposals. The evaluators adhered to the Solicitation, which advised interested bidders of the evaluation criteria and their relative importance. If discussions might have increased the pool of acceptable bidders to include plaintiff, this does not necessarily mean that the agency was required to conduct them.

We do not re-weigh evidence presented to the contracting officer. Her decision to award the contract to Ferguson–Williams is supported by the record. Rig Masters' proposal had at least two technical deficiencies—insufficient staffing and insufficient equipment. AR 99. Evaluators identified three additional weaknesses in its proposal. They found (1) a "lack of [ ] positions"; (2) "[ ] positions at Enid [Lake] are abolished"; and (3) "limited authority provided to [ ]." *Id.* Such findings as well as a lack of comparable relevant experience understandably gave the agency pause regarding plaintiff's ability to perform the contract requirements adequately. Rig Masters has not even argued, let alone demonstrated, that the Corps' findings are not supported by the record or inconsistent with the Solicitation.

Plaintiff has done little more than offer its subjective disagreement with the contracting officer's conclusions with respect to its proposal. "Such naked claims . . . fall far short of meeting the heavy burden of demonstrating that [the agency's] findings were . . . arbitrary and capricious." *JWK Int'l Corp.,* 52 Fed.Cl. at 660. The Solicitation placed all potential bidders, including plaintiff, on notice that the Corps of Engineers intended to award the contract without discussions. The Corps acted within its discretion and consistent with the Solicitation when it rejected plaintiff's initial proposal and was not obligated to enter into discussions with plaintiff. We need not provide plaintiff the opportunity now to revise deficiencies in its proposal in light of such an unambiguous warning. *See id.* at 663 ("There generally is no obligation that a contracting agency conduct discussions where the RFP specifically instructs offerors of the agency's intent to award a contract on the basis of initial proposals.") (internal citation omitted).

Plaintiff cites *Day & Zimmermann Servs. v. United States*, 38 Fed.Cl. 591, 604 (1997) for the principle that an agency's discretion is not "unfettered." That court noted "peculiar circumstances" could create an exception to the general rule that courts should respect the actions of procurement officials exercising their discretionary functions. *Id.* The general rule prevails in our case, however.

The solicitation in *Day* informed offerors that the Government intended to make the award without discussions, but several factors caused the court to "question the propriety" of the agency's decision in this regard. *Id.* at 605. Among those was the agency's use of an undisclosed benchmark against which the Government compared the cost and quality aspects of offerors' proposals. *Id.* at 607. The administrative record in that case also led the court to call into question the accuracy of the Government's benchmark. *Id.* The court upheld the bid protest where "the totality of the circumstances" demonstrated that discussions were warranted, and the agency's failure to conduct discussions was an abuse of discretion. *Id.* at 608.

Rig Masters has not identified a comparable basis for us to question the contracting officer's decision not to conduct discussions. The Government did not use an "undisclosed benchmark" or similarly vague device in this case to evaluate the offerors' proposals. The Corps evaluated the proposals against the staffing and equipment requirements of the previous Mississippi Lakes contractor. The Solicitation included such requirements in standardized sample forms for interested bidders. The forms were not proposal requirements, but bidders should have found them helpful in evaluating the contract's technical requirements.

### C. The Corps Did Not Violate Any Applicable Procurement Statute or Regulation

■ Plaintiff lastly contends that the Government has violated both procurement statute and regulation by awarding the contract only on initial competitive proposals, without discussions. Plaintiff bases its allegation in part on 10 U.S.C. § 2305(b)(4)(C). This statute requires an agency to award the contract to the bidder "whose proposal is most advantageous to the United States." Plaintiff also suggests that the Corps has violated FAR 15.303(b)(6), which mandates that the agency select the "proposal [that] is the best value to the Government." Plaintiff argues that the Corps could not have determined which proposal was "most advantageous to" or "the best value to" defendant without engaging in discussions with all interested contractors. We cannot detect any legal or factual merit to plaintiff's claims on these bases.

Plaintiff asserts it would have required the Corps only an additional thirty-three days to award the contract on revised proposals after a competitive range determination, and then discussions. The problem with this argument is that it was for the contracting officer to decide in the first instance whether discussions were warranted. 48 C.F.R. § 15.306; see, e.g., *WorldTravelService v. United States*, 49 Fed.Cl. 431, 439 (2001). She believed they were not, and we concluded that decision was rational and soundly supported by the record. Thus, what impact an additional thirty-three days would have on the procurement is not for us to decide at this juncture.

■ In any event, Rig Masters has not demonstrated any Corps of Engineers' error that has significantly prejudiced plaintiff. Bald assertions that discussions "could have significantly changed" the outcome are not sufficient. To demonstrate prejudice, the protestor must identify specific facts tending to show that "there was a reasonable likelihood that the protestor would have been awarded the contract" but for the alleged error. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996).

The record does not suggest that the Corps would have awarded the contract to Rig Masters if the agency had conducted discussions. Several aspects of the record appear to indicate to the contrary in fact. Despite the evaluators' concerns regarding its staffing and equipment deficiencies, plaintiff nevertheless received an overall technical score of [ ]. In addition to the technical issues, Rig Masters' past performance concerned the contracting officer. It had a[ ]

past performance risk, whereas the awardee Ferguson's past performance risk was considered [ ]. The Solicitation included the relative importance of the evaluation factors: technical is more important than past performance; past performance is more important than cost; technical and past performance, when combined, are significantly more important than cost. Even if Rig Masters offered greater savings to the Government, a lower risk offeror was more important. The contracting officer's decision reflected this point: "[t]he technical evaluation is more important than past performance, and past performance is more important than cost, allowing the possibility of paying more to obtain the higher rated technical proposal." AR 94.

Plaintiff misconstrues the contracting officer's agenda when it argues that she really made the award based on cost. The record plainly shows she recognized Rig Masters had the lowest cost offer. Rig Masters presented a cost savings to the Government of about [ ], as compared with Ferguson.[4] Cost was the least important of the three evaluation criteria, however. The cost savings to

the Government by contracting with Rig Masters was not enough to overcome the agency's concerns as reflected in its risk ratings. The contracting officer's best value decision establishes how she weighed the evaluation factors:

> Tradeoff: The lowest price (evaluated most probable cost for each offeror) proposal is not the superior proposal in terms of non-cost factors, therefore a tradeoff analysis was conducted to determine the best value to the Government. [ ] received a *higher Overall Technical Rating* and a higher rating in all technical sub-factors compared to Ferguson–Williams. [ ], however, possesses [ ] performance risk. [ ]'s evaluated cost is [ ] higher than Ferguson and [ ] higher than Rig Masters. ... [ ]'s [ ] performance risk somewhat negates its more superior technical proposal.

AR 94–95.

The following table summarizes the evaluators' ratings, the proposed cost, and the most probable cost for Rig Masters, Ferguson–Williams, and [ ]:

| Offeror | Consensus Ratings | | Cost | |
| | Technical/ Risk | Past Performance/Risk | Proposed | Most Probable Cost |
| --- | --- | --- | --- | --- |
| Rig Masters | [ ] | [ ] | [ ] | [ ] |
| Ferguson–Williams | [ ] | [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] | [ ] | [ ] |

AR 98. Assuming Rig Masters was included in such a tradeoff, its [ ] performance risk would have somewhat or even fully have negated its equally rated technical proposal. The contracting officer found it is reasonable, in light of the technical differences between Ferguson and [ ], to pay less money for a proposal of lesser technical merit given the additional performance risk associated with [ ]. It is likely then, that the contracting officer would have chosen Ferguson over Rig Masters, even after discussions. Rig Mas-

ters had the same "additional performance risk" that [ ] had, but without the higher technical rating. Because cost was the least important of the three factors, an approximately [ ] savings to the Corps likely would have been considered negligible. Paying [ ] more to Ferguson would have been worth the performance risk involved with contracting with Rig Masters. Other problems with Rig Masters may have been fatal to its being selected, notwithstanding its benefit in terms of price.

4. This was after the Corps adjusted the bids and derived a most probable cost for each offeror.

## D. Supplementing the Administrative Record

■ The decision whether to supplement the administrative record rests within the discretion of the trial court, and generally we will permit supplementation for two principal purposes: to assist the court in understanding an agency decision when the record has not adequately explained it, and to place in the record material that, by its very nature, would not be contained in it, such as evidence of bias or bad faith. *See, e.g., Orion Int'l Techs. v. United States,* 60 Fed.Cl. 338, 343–44 (2004). Otherwise, our review is confined to "the administrative record already in existence." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Plaintiff has not alleged bias or bad faith on defendant's part.

■ Plaintiff's documents are a series of Declarations and handwritten notes related to the post-award debriefing. Each Declaration attests to a conversation at the debriefing between Rig Masters' President and the contracting officer and serves as an attempt to call into question the actual basis for the Corps' award. The notes are Rig Masters' minutes from the debriefing. The Government has objected to such supplementation by plaintiff but has requested that, if we admit plaintiff's documents, we correspondingly allow admission of similar declarations of Government officials.

■ The record contains detailed explanations of the bases for the evaluators' decisions. The record also includes a three-page memorandum detailing the events that occurred at the September 22 debriefing. The Declarations do not contain information that is not adequately explained elsewhere. Moreover, these materials do not relate to events that transpired *during the procurement process.* They involve the debriefing that occurred only after the parties received notification that the Corps had chosen a contractor. We review the materials before the agency when it made its procurement selection and cannot accept any "post hoc rationalizations" offered as the basis for the decision. *See Al Ghanim Combined Group Co.*

*Gen. Trad. & Cont. W.L.L. v. United States,* 56 Fed.Cl. 502, 508 (2003) (citing *Citizens to Preserve Overton Park,* 401 U.S. at 419, 91 S.Ct. 814). Plaintiff's and defendant's motions to supplement are denied.

## CONCLUSION

The Corps of Engineers' actions were not arbitrary or capricious, and plaintiff has not identified a single violation of law or procedure by the Corps. Plaintiffs arguments generally are conclusory and repetitive; they do not come close to meeting the high standards required of a bidder who would overturn the procurement decision of a contracting officer.

The parties will file proposed redactions to this Opinion no later than April 10, 2006. Plaintiff's motion for judgment on the administrative record is DENIED. Defendant's cross-motion for judgment on the administrative record is GRANTED. The Clerk of Court will enter judgment for defendant. No Costs.